UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LAUTRINDA BAKER,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 16-cv-05611-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. No. 18, 21

## INTRODUCTION

Plaintiff Lautrinda Baker ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Nancy A. Berryhill ("Defendant"), the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits. Pending before the Court are the parties' cross-motions for summary judgment. Dkt. Nos. 18, 21. Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument. Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and the relevant legal authority, the Court hereby **GRANTS IN PART** Plaintiff's motion and **DENIES** Defendant's cross-motion for the reasons set forth below.

## BACKGROUND

Plaintiff was born in 1970. In 2012, she began to experience chronic pain in her back and hip. Subsequently, she developed chronic pain in her neck and shoulders. Imaging studies and physician examinations revealed abnormalities in her lumbar and cervical spine. Her pain progressively worsened. Despite acupuncture, pain medication, and physical therapy, Plaintiff continued to experience physical limitations and pain. Her treating physician diagnosed Plaintiff with a number of conditions relating to her back, neck, and shoulders; he also diagnosed fibromyalgia.

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

On November 20, 2012, Plaintiff filed a claim for Disability Insurance Benefits under Title II of the Social Security Act, alleging disability beginning on August 27, 2012. On November 6, 2014, she applied for Supplemental Security Income under Title XVI of the Act. On May 9, 2013, the Social Security Administration ("SSA") denied Plaintiff's Title II claim, finding that Plaintiff did not qualify for disability benefits. Plaintiff subsequently filed a request for reconsideration, which was denied on December 5, 2013. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). ALJ Nancy Lisewski conducted a hearing on December 22, 2014. Plaintiff testified in person at the hearing and was represented by counsel, Beth Mazie.

**A.      Plaintiff's Testimony**

In August 2012, Plaintiff's doctor told her to stop working full-time and drop to four hours per day because of problems with her back and hip. AR 45. In February 2013, she stopped working after she was hospitalized for heart problems and had heart surgery. AR 46, 51-53. Her employer informed her she had to return to work in July or would be terminated. AR 46. She returned to work, but only worked three hours a week. AR 46. In November 2013, her doctor again ordered her to stop working because she could neither sit nor stand very long. AR 46. She has not worked since. AR 46.

She is unable to work full time because her back, shoulders, and neck constantly hurt. AR 48. The pain in her back causes it to lock up, and radiating symptoms cause her to be unable to feel her left leg at times. AR 49. She has burning pain in her shoulder and neck with tingling into the fingers. AR 49. She gets chest pain and sometimes feels short of breath. AR 49. She has difficulty with activities such as sitting, standing, getting out of the tub, putting on her clothes, cooking, and holding things. AR 50. About twice a week, her pain is so intense that she stays in bed and does not shower or dress that day. AR 50-51. Her hands, feet, and ankles constantly swell. AR 53.

She sometimes needs help with shopping because she does not move well; a friend named Manual goes to the store for her. AR 54. If she does go to the store, she goes with Manual. AR

54. Manual also takes care of her cooking, cleaning, and laundry. AR 55. Her brother also comes by her home and helps her at times. AR 55. Walking short distances, for example to her mailbox, is difficult for her; pain limits her standing to fifteen minutes at a time; she can sit about twenty minutes at a time; she cannot lift even a gallon of milk. AR 56-57. She sees a physical medicine and rehabilitation specialist, Michael Hebrard, M.D., who prescribed Lyrica and cyclobenzaprine. AR 58.

Plaintiff is depressed; she gets regular psychotherapy from Nancy Kersey, MFT. AR 59-60, 614. Therapy has not been very helpful; she still feels depressed, upset, and angry about the murder of her son. AR 61. Her son disappeared in 2009, and Plaintiff discovered he had been murdered in 2013 when his remains were found. AR 60-61.

**B.      Medical Evidence of Record**

1.      Dr. Michael E. Hebrard, M.D.

*i.      Treatment Records*

Dr. Hebrard is board-certified in physical medicine and rehabilitation; he specializes in physical medicine, pain management, and electrodiagnostic medicine. AR 368. Plaintiff began treatment with Dr. Hebrard in September 2012 after experiencing several months of pain in her left hip and low back. AR 365-68. Dr. Hebrard performed a physical examination and a battery of "provocative tests" at each of Plaintiff's appointments. He repeatedly documented tightness and trigger points in Plaintiff's back; diminished lumbar flexion; paresthesia along the left foot and fingers; positive facet joint testing bilaterally; diminished lumbar range of motion; loss of sensation in the lower left extremity; loss of strength of some of the muscles of the legs and feet; severe motor loss; and suppressed or overly active reflexes. *See, e.g.*, AR 365-68 (September 2012), 264 (December 2012), 320 (January 2013), 639-42 (October 2013), 652-55 (November 2013), 618-21 (October 2014).

In September 2012, Dr. Hebrard examined Plaintiff and performed a battery of tests. AR 365-66. He observed functional deficits in terms of sitting, standing, walking, pushing, pulling, reaching and lifting; diagnosed left hip bursitis, lumbosacral strain, and illiotibial band friction

syndrome on the left. AR 366. He recommended physical therapy ("PT") twice a week for five weeks, a self-directed home exercise program, custom orthotics, and lumbar support (not be used more than 2 hours in an 8-hour work day, and for no more than 2 consecutive days). AR 367; *see also* AR 643 (noting in October 2013 that the PT helped with pain, but Plaintiff lost focus when she had her cardiac surgery; recommending another twelve PT sessions to help treat pain). He ordered an EMG nerve conduction test be performed on Plaintiff to help diagnose conditions that caused her pain, weakness, and numbness in her lower extremities, for example, to determine whether there has been nerve root entrapment. AR 367. He also recommended Plaintiff get a vascular flow study to further assess her vascular and venous systems. AR 368.

The EMG/nerve conduction study that was performed in November 2012 showed possible bilateral L5 radiculopathy. AR 324, 328. Dr. Hebrard recommended Plaintiff obtain an MRI. AR 324. An MRI dated December 13, 2012 revealed mild facet arthropathy from L2-3 through L5-S1, with a small amount of effusion at L2-3 and L3-4; it also showed mild to moderate disc height loss and desiccation at L2-3 and moderate disc height loss at L3-4; it also revealed a synovial cist at L3-L4. AR 321, 326.

In January 2013, Dr. Hebrard diagnosed a number of conditions, including lumbosacral degeneration with piriformis syndrome causing sciatic neuropathy. AR 321. He stated he would like to start Plaintiff on facet joint injections and would get authorization for that treatment. AR 321. (There is no indication in the AR whether this treatment was authorized and provided.)

Plaintiff also saw Dr. Hebrard when she developed pain in her neck and shoulders. AR 651-52. In November 2013, Dr. Hebrard noted crepitus of both shoulders, trigger points in the cervical/scapular regions, and diminished cervical range of motion. AR 652. Dr. Hebrard noted paresthesia along six digits, overly brisk reflexes in the arms, and diminished strength in the arms. AR 653. A November 2013 MRI of the cervical spine showed a disk/osteophyte complex at C5-6 causing mild spinal stenosis as well as disc bulging at C3-4 and C4-5. AR 662-63. An MRI of the right shoulder showed mild acromioclavicular degenerative changes and tendinopathy at the supraspinatus tendon. AR 661, 655. Dr. Hebrard noted that Plaintiff's combination of issues

4

pertaining to her neck and right shoulder had been getting progressively worse, but that she was not a surgical candidate as a result of her pre-existing heart condition; he also noted her chronic pain that had caused emotional anxiety problems. AR 655; *see also id.* ("Given the frailty of her cardiac history and recent cardiac ablation . . . in combination with her musculoskeletal condition involving the cervical spine and right shoulder, the patient presents with a complex chronic pain history."). A November 2013 MRI of Plaintiff's lumbar spine showed "[c]onsiderable loss of disc height and partial disc desiccation" at L2-3 and moderate loss of disc height with disc desiccation at L3-4. AR 655, 664.

When Plaintiff visited him because of a flare up of her cervical spine in January 2014, Dr. Hebrard noted trigger points in seven regions. AR 634. He found paresthesias. *Id.* He found brisk reflexes with diffused weakness consistent with a mild myelopathy. AR 635. He requested a consultation with an orthopedic spine surgeon for possible surgical intervention in the neck. AR 634-35. Dr. Hebrard diagnosed lumbar sprain/strain, lumbar disc degeneration, and lumbosacral neuritis/radiculitis; he prescribed Lyrica and PT. AR 570, 620, 649.

Plaintiff also consulted Dr. Hebrard in April 2014 due to pain and tenderness throughout her body, which Dr. Hebrard diagnosed as fibromyalgia. AR 631-32. The diagnosis was reached and maintained after Dr. Hebrard noted multiple tender points above and below the waist, complaints of fatigue, weakness, cold intolerance, irritability, and decreased tolerance for loud noises. AR 619, 620, 624-25, 628-629, 632. Because of Plaintiff's history of cardiovascular disease, Dr. Hebrard noted she was unable to take NSAID medications.[1] AR 629. Dr. Hebrard prescribed Lyrica for fibromyalgia; his goal was to reduce Plaintiff's pain by 50% and maximize her function with standing, walking, and activities of daily living. AR 629.

Plaintiff's neck and shoulder pain continued into late 2014. AR 618.

ii. *Disability Paperwork*

Dr. Hebrard completed several employer-issued certification forms supporting Plaintiff's

_____

[1] Nonsteroidal anti-inflammatory drugs.

request for family and medical leave.  AR 311-313, 341-42, 560-63.  In the first form, which was completed at some point between September 2012 and June 3, 2013, Dr. Hebrard indicated Plaintiff's chronic back condition prevented her from sitting, standing, walking, lifting, or reaching for long periods of time; that Plaintiff would need to miss work to attend monthly doctor's appointments, and due to weekly flare ups in her condition; and that her condition would prevent her from working between October 4, 2012 through September 20, 2014.  AR 311-13.  In the November 2012 certification, Dr. Hebrard indicated Plaintiff would be intermittently incapacitated and unable to work through November 18, 2013.  AR 341.  He noted Plaintiff would need to be seen on a biweekly basis for medical visits and twice a week for physical therapy.  AR 341.  He stated she could work 4 hours daily, with 30 minutes standing and 30 minutes sitting.  AR 342.  He stated it would be medically necessary for her to miss work due to flare ups.  AR 342.  In the December 2013 certification, Dr. Hebrard explained the results of Plaintiff's C-spine and L-spine MRIs, as well as the results of her right shoulder MRI.  He wrote Plaintiff had complex chronic pain and limited functional tolerance and ability.  AR 560.  Dr. Hebrard noted Plaintiff was first precluded from working on November 20, 2013, and that he expected her condition would be permanent.  AR 561.  He anticipated Plaintiff would need time off work on a weekly basis for PT and acupuncture, and monthly for office visits.  AR 561.  He also documented eight office visits between December 2012 and November 2013, including four visits in October through November 2013.  AR 562.

In April 2013, Dr. Hebrard completed a Work Restrictions note indicating Plaintiff was restricted to standing no more than 15 minutes a day and lifting no more than 10 pounds intermittently.  AR 318.  In November 2013, Dr. Hebrard provided a work excuse to Plaintiff confirming she was totally temporarily disabled from November 20, 2013 through January 16, 2014.  AR 564.

Dr. Hebrard also completed a physician source statement on July 10, 2014.  AR 566-67.  He summarized the results of the December 2012 MRI, the November 2012 EMG, and the cervical spine MRI.  AR 566.  He explained that Plaintiff suffered from chronic shoulder pain, that

MRI results showed degenerative changes and tendinopathy, and that she had ongoing issues with shoulder pain and limitations. *Id*. Dr. Hebrard does not explain how the conditions identified by these various objective tests affect Plaintiff's ability to function. He documented the results of his examinations and opined that due to her "complex multifactorial medical issues, she is not a candidate for any full time work" because her condition requires treatment such as PT due to frequent flare ups, and office visits. AR 566. Dr. Hebrard estimated Plaintiff would miss about five days of work per month if she attempted to work full time. AR 566. He also opined that Plaintiff was limited to standing and walking less than 2 hours in an 8 hour workday, was limited to sitting 4 hours in an 8-hour workday, and needed to be able to change positions at will to relieve her pain. AR 566. Dr. Hebrard invited the SSA to contact him if further information was needed.

### 2. Doctors Medical Center

Plaintiff visited the Doctors Medical Center in February 2013 complaining of a rapid pulse. AR 267. Dr. Weiland noted Plaintiff had had some type of heart surgery when she was a child, examined Plaintiff and noted her heart rate was 100 and irregular; he admitted her with an atrial flutter, symptomatic, and started her on Lovenox and Amiodarone; he ordered a cardiac echocardiogram and iron studies. AR 268. The cardiac echocardiogram showed cardiomyopathy, significantly reduced left ventricular function with an ejection fraction of only 25%, and atrial flutter with moderate ventricular response. AR 546-47. Plaintiff underwent an ablation to convert her back to normal sinus rhythm. AR 277-279. The ablation improved Plaintiff's heart function, but she continues to have occasional chest pain, shortness of pain, and intermittent edema of the lower extremities. AR 372, 378, 381, 429, 510, 573-74, 587, 603, 641. Plaintiff gained more than 40 pounds after the ablation. AR 263, 579.

A September 2013 sleep study showed mild to moderate obstructive sleep apnea with oxygen desaturation to 89%; it was also consistent with depression. AR 513-18. She was prescribed a CPAP machine. AR 496, 516. Her prognosis was noted as "good." AR 516.

Dr. Raees, who evaluated Plaintiff's sleep patterns, indicated she should be referred to a psychiatrist to address her depression; he noted in September 2013 that Plaintiff "does not have

7

any pathological sign of depression[, ] is a very happy lady but I think she has some family issues." AR 513.

### 3. Nancy Kersey, MFT

Plaintiff started attending weekly psychotherapy sessions with Nancy Kersey in March 2014. AR 614. In September 2014, Ms. Kersey submitted a letter to Plaintiff's attorney in connection with her application for Social Security benefits. *Id*. Ms. Kersey identified symptoms of depressed mood, feelings of worthlessness, anhedonia, poor energy, irritability, lack of concentration, and sleep disturbance with nightmares; she diagnosed Post Traumatic Stress Disorder ("PTSD"). *Id*. Ms. Kersey explained Plaintiff's father had been murdered when she was four years old, that she had experienced domestic violence, and that her son disappeared in 2009, and when her son's remains were discovered four years later, his death was ruled a homicide. *Id*. She observed Plaintiff's symptoms had improved over the course of her treatment, to the point where their sessions had been reduced to a biweekly basis.

Ms. Kersey found Plaintiff to be very credible, reliable, motivated, and consistent. *Id*. She observed Plaintiff frequently experienced pain during their sessions, and some limitations in the use of Plaintiff's right arm. *Id*.

### 4. Dr. Eugene McMillan, M.D.

On April 10, 2013, Dr. McMillan examined Plaintiff as a consultant for the SSA. AR 301-303. He is board certified in internal medicine. He noted Plaintiff's chief complaint was her heart problem. AR 301. He obtained Plaintiff's medical history directly from her; there is no indication he reviewed any of her medical records except for a report of a December 28, 2012 EMG. AR 301. He performed an examination, and observed Plaintiff was able to walk and get on and off the examination table without assistance; she had over 30 pounds of grip strength in each hand; normal range of motion in wrists, elbows, shoulders, hops, knees and ankles; normal strength; and normal reflexes. AR 303. He acknowledged that Plaintiff gave a history of low back pain, but observed she had preserved deep tendon reflexes and no muscular weakness. AR 303. His impressions were that Plaintiff had atrial flutter (status post-ablation procedure), a history of

8

congenital heart disease (treated with surgery), and a history of cardiomyopathy.  AR 303.  As is relevant here, Dr. McMillan found she had no limitations in sitting, reaching, manipulation; and she could stand and walk for six hours in an eight-hour workday with a break every half hour.

### 5. Dr. S. Amon, M.D.

On May 8, 2013, SSA consultant Dr. Amon reviewed some of Plaintiff's medical records, including Dr. McMillan's report; records from Dr. Weiland dated March 19, 2013; and records from the Doctor's Medical Center dated March 13, 2013.  AR 67-73.  As described above, Dr. Weiland is the cardiologist who treated Plaintiff for her atrial flutter, and Dr. McMillan also focused on Plaintiff's heart condition.  Based on those two medical records, Dr. Amon acknowledged Plaintiff had a history of heart disease, but found no significant functional limitations as a result; Dr. Amon also acknowledged Plaintiff alleged low back and hip pain, but found no significant objective findings to support it.  AR 70.

Dr. Amon opined Plaintiff had the Residual Function Capacity ("RFC") to occasionally lift or carry up to twenty pounds, frequently lift or carry up to ten pounds, stand and/or walk a total of four hours a day, sit for about 6 hours a day, and had no other limitations.  AR 72-73.

### 6. Dr. Sandra Battis, M.D.

SSA consultant Dr. Sandra Battis reviewed Plaintiff's record on reconsideration.  AR 76-85.  Dr. Battis focused on Plaintiff's complaints of increasing back and hip pain, and reviewed several additional medical records, the latest of which were received in October 2013.  AR 78-80.  This review included records from Dr. Hebrard received on October 9, 2013.  AR 78.  Dr. Battis found the evidence supported the initial assessment and adopted the original RFC.  AR 81, 83.

## D. The ALJ's Findings

The regulations promulgated by the Commissioner of Social Security provide for a five-step sequential analysis to determine whether a Social Security claimant is disabled.[2]  20 C.F.R. §

---

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical impairment which can result in death or "which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

404.1520. The sequential inquiry is terminated when "a question is answered affirmatively or negatively in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990). During the first four steps of this sequential inquiry, the claimant bears the burden of proof to demonstrate disability. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009). At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work." *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b). Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since August 27, 2012.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act. 20 C.F.R. § 404.1520(a)(4)(ii). If no severe impairment is found, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Here, the ALJ determined that Plaintiff had the following severe impairments: lumbar degenerative disc disease with associated radiculopathy, cervical stenosis, tendinitis of the shoulder, fibromyalgia, atrial flutter, essential hypertension, obesity, and PTSD.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, where the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments"). 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, she is conclusively presumed to be disabled, without considering age, education and work experience. 20 C.F.R. § 404.1520(d). Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets the listings.

Before proceeding to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). RFC refers to what an individual can do in a work setting, despite mental or physical

limitations caused by impairments or related symptoms. 20 C.F.R. § 404.1545(a)(1). In assessing an individual's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including the medically determinable impairments that are nonsevere. 20 C.F.R. § 404.1545(e). Here, the ALJ determined that Plaintiff has the RFC to perform a full range of light work, except that she could walk/stand for no more than 30 minutes at a time and for no more than six hours per day; could only occasionally stoop, kneel, crouch or crawl; and could perform no more than unskilled, simple, and routine tasks.

The fourth step of the evaluation process requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f). Past relevant work is work performed within the past 15 years that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant has the RFC to do her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4) (iv). Here, the ALJ determined that Plaintiff could not perform her past relevant work as a sales assistant, store laborer, or caregiver.

In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g); 404.1560(c). The Commissioner can meet this burden by relying on the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpt. P, App. 2. *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). Here, based on the testimony of the vocational expert, and Plaintiff's age, education, work experience, and RFC, the ALJ determined Plaintiff could work as a cashier II, cleaner/polisher, or storage facility rental clerk, jobs that are found in significant number in the national economy.

**E.      ALJ's Decision and Plaintiff's Appeal**

On March 20, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. This decision became final when the Appeals Council declined to review it on August 8, 2016. Having exhausted all administrative remedies, Plaintiff commenced this action for judicial

11

review pursuant to 42 U.S.C. § 405(g). On May 4, 2017, Plaintiff filed the present Motion for Summary Judgment. On July 5, 2017, Defendant filed a Cross-Motion for Summary Judgment.

## LEGAL STANDARD

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g). The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards." *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted). "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)). The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ. *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision. *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990). A court may not reverse an ALJ's decision on account of an error that is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)). "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'" *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

## DISCUSSION

Plaintiff challenges the SSA's decision on two grounds. First, she argues the ALJ did not give specific and legitimate reasons for discounting the opinion of her treating physician, Dr. Hebrard. Second, she argues the ALJ did not state clear and convincing reasons for rejecting her

testimony.

**A.      Dr. Hebrard**

     1.    <u>Standards for Evaluating Medical Opinions</u>

Physicians may render medical opinions, or they may "render opinions on the ultimate issue of disability—the claimant's ability to perform work." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).

In order to reject the "uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (quotation and citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* (citation omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. "The ALJ must do more than offer [] conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

An ALJ errs when he or she does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, it is error for an ALJ not to offer a substantive basis before assigning little weight to the medical opinion. *See id.* Generally, the SSA will give greater weight to an opinion that is more consistent with the record as a whole. 20 C.F.R. § 416.927(c)(4).

An "ALJ should not be a mere umpire during disability proceedings, but must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Widmark v.*

*Barnhart*, 454 F.3d 1063, 1068 (9th Cir. 2006) (citation and quotation marks omitted); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (ALJ has "a duty to conduct an appropriate inquiry" if she believes she needs to know the basis of a treating physician's opinions in order to evaluate them); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence . . . triggers the ALJ's duty to 'conduct an appropriate inquiry.'" (quoting *Smolen*, 80 F.3d at 1288)).

### 2. The ALJ's Evaluation of Medical Opinions

The ALJ gave the most probative weight to Dr. McMillan's April 2013 report. AR 26. The ALJ summarized the results of the examination. *Id.* "Given that Dr. McMillan is a board certified specialist in internal medicine, given the relatively benign results of his comprehensive internal medicine evaluation, and given no significant credible evidence in the record which would rebut his overall findings," the ALJ accorded Dr. McMillan's functional assessment "great evidentiary weight." *Id.* The ALJ found Dr. McMillan's assessment was supported by the evaluations of Dr. Amon and Dr. Battis, who agreed Plaintiff exhibited no current significant cardiac functional limitations and that there were no significant objective findings to support her allegations of back and hip pain. AR 26-27. The ALJ gave Dr. Hebrard's opinions "only minimal evidentiary weight" and concluded his report "seem[ed] most consistent with an advocacy document." AR 27-28.

### 3. Analysis

The ALJ did not offer specific and legitimate reasons based on substantial evidence for rejecting Dr. Hebrard's opinions, much less "clear and convincing" reasons. The ALJ gave only the following reasons for rejecting Dr. Hebrard's opinions:

(1) The ALJ acknowledged Dr. Hebrard's "reports" dated November 20, 2013 and December 20, 2013. These "reports" are in fact certification forms Plaintiff was required to provide to her employer to be medically excused from work. In these forms, Dr. Hebrard stated Plaintiff was totally disabled and should be off work from November 20, 2013 to January 16, 2014. AR 27. The ALJ rejected the notes as "completely conclusionary, containing no findings from physical examinations." *Id.* She further found Dr. Hebrard's comments "vague and

nonspecific" and "without meaning without independent supporting findings from examination

and clinical studies." *Id.* She also noted Dr. Hebrard's December 2013 note indicates Plaintiff

was only disabled as of November 20, 2013, and thus gives no reason to support Plaintiff's alleged

onset date of December 4, 2012.[3] AR 27. The ALJ's concern about the November 20, 2013 onset

date would have been alleviated if the ALJ had reviewed Dr. Hebrard's first note, which declared

Plaintiff disabled as of October 4, 2012 (AR 311-12), or his July 2014 Report, which opined

Plaintiff was disabled before September 2012 (AR 566-67).

(2) The ALJ acknowledged "several clinical studies" in the record but concluded "the

findings related to these reports are not indicative of any significant orthopedic pathology or

dysfunction." AR 27. She criticized Dr. Hebrard for failing to state "exactly what comprises

[Plaintiff's] limited functional tolerance." *Id.* The ALJ wrote that the three MRIs in the record

identify "alleged" degenerative changes, but concluded the studies "fail[] to indicate with any

specificity the severity and associated functional consequences of such alleged spinal and right

shoulder degenerative changes." AR 28. Even so, this is not a reason to reject Plaintiff's claim:

the ALJ has a responsibility to develop the record. *Widmark*, 454 F.3d at 1068. Rather than

dismissing Dr. Hebrard's opinions because he did not provide sufficient specificity, the ALJ

should have inquired as to the basis of his opinions. *Smolen*, 80 F.3d at 1288.

(3) The ALJ stated she "reviewed the underlying treatment documentation of Dr. Hebrard"

but found "such documentation does not reveal the presence of a medically determinable

impairment or combination or impairments which would impose functional limitations in excess

of the" RFC assessment she adopted. AR 28. She cited exhibits 1/F, 5/F, 13/F, 16/F and 17/F as

the underlying treatment documentation she reviewed, but does not analyze the records. The

Court does so in her stead:

Exhibit 1/F is a progress note from December 10, 2012, where Dr. Hebrard reported

abnormal findings in a positive straight leg test at 60 degrees bilaterally, positive Slump test

---

[3] The Court notes Plaintiff's alleged onset date is August 27, 2012; it is not clear where the ALJ
found the December 4, 2012 date.

bilaterally, and positive facet maneuver; noted the November 2012 EMG test showed a possible L5 radiculopathy, and recommended Plaintiff have an MRI of the lumbosacral spine. AR 264.

Exhibit 5/F is a 59 page exhibit that includes multiple progress notes from Dr. Hebrard, MRI and EMG results, and PT progress notes. In a September 2012 progress note, Dr. Hebrard notes trigger points in the iliolumbar region as well as the peritrochanteric region, and tightness along the IT band; some paresthesia along the left foot; deep tendon reflexes at 2/4 in the biceps, triceps, and brachial radialis; reduced hip flexion and abduction; slightly positive Slump test, and positive facet maneuver bilaterally. AR 366. He opines that Plaintiff has functional deficits in terms of sitting, standing, walking, and reaching. AR 366. Dr. Hebrard recommended orthotics, lumbar support, an EMG, a vascular study, and PT. In a January 21, 2013 progress note, Dr. Hebrard indicated abnormal results for Slump test bilaterally and positive facet maneuver; reviewed the impressions from Plaintiff's December 2012 MRI of the lumbar spine; opined to a "reasonable degree of certainty" that Plaintiff's ongoing condition was "axial back pain primarily, with an overlapping piriformis syndrome causing sciatic neuropathy"; and recommended Plaintiff receive facet injections and home exercise. AR 320-21.

Exhibit 13/F are progress notes from Pacific Orthopaedic and Sports Rehabilitation dated August 15, 2014 and June 19, 2013. AR 569-571. They indicate Plaintiff has reduced range of motion in her right shoulder and cervical spine, and has diffuse cervical and shoulder girdle tightness and myofascial restrictions after PT; the notes further indicate that the goal of PT is to restore range of motion without pain, and that Plaintiff is able to perform activities of daily living, including brushing hair and donning shirts, with minimal discomfort. AR 569-70.

Exhibit 16/F is another 51 page exhibit. An October 28, 2014 progress note from Dr. Hebrard indicates his examination revealed trigger points in six regions, decreased strength in upper right extremity, decreased sensation to light touch in right arm and hand and left upper leg; and abnormal results to SI joint compression test. AR 619-20. A September 2014 progress note documents similar results and states the examination is consistent with fibromyalgia syndrome. AR 624-25. A June 2014 progress note documents similar results, states Plaintiff presents with

subjective complaints consistent with the objective findings, and has multiple tender points consistent with fibromyalgia.  AR 629.  In April 2014, Dr. Hebrard noted similar test results and found Plaintiff presented with the clinical presentation of fibromyalgia.  AR 632.  In January 2014, Dr. Hebrard reported multiple trigger points, decreased strength, paresthesia to fingers, a positive Spurling's test, a flare up of Plaintiff's cervical spine; Dr. Hebrard recommended Plaintiff consult an orthopedic spine surgeon.  AR 633-35.  In October 2013, Dr. Hebrard reported multiple trigger points; pitting edema bilaterally in her lower extremities; reduced strength; decreased sensation to light touch in left side; and abnormal reflexes.  AR 642.  He stated Plaintiff presented with progressive pain and weakness and had functional deficits; he recommended she be limited to sedentary work and some pain medication and prescribed PT.  AR 642-43.  In November 2013, Dr. Hebrard noted abnormal results for Adson's, Hawkins', and Speed tests, and an equivocal result for Spurling's examination; he noted decreased strength; paresthesias along the digits; and hyperreflexic deep tendon reflexes at the biceps, triceps and brachioradialis.  AR 653.  He noted problems with Plaintiff's neck and right shoulder had been getting progressively worse.  AR 655.

Exhibit 17/F are progress notes from Plaintiff's primary care physician, Dr. James Watson, in which he documents Plaintiff's complaints of pain, completes an MRI request form for the right shoulder/neck, authorizes a transportation request because Plaintiff is a fall risk and cannot use public transport, and orders x-rays and other tests and consultations to attempt to diagnose Plaintiff's pain.  AR 666-682.  Dr. Watson's records are dated September 2013-December 2014. *Id*.

Instead of setting out a detailed and thorough summary of the facts and conflicting clinical evidence (*Reddick*, 157 F.3d at 725), the ALJ cited exhibits comprising hundreds of pages of treatment records by Dr. Hebrard and the results of imaging studies and dismissed them with a couple of sentences.  AR 28.  She failed to explain how the documented abnormalities in Plaintiff's lumbar and cervical spines could not support the types of limitations Dr. Hebrard believed existed, and for which he treated Plaintiff.  This failure is particularly egregious with respect to treatment records after October 2013, as these later records were never reviewed by any

17

other physician. These records included Dr. Hebrard's progress notes, diagnoses, and opinions about Plaintiff's progressively worsening neck and shoulder pain and fibromyalgia. The ALJ did not set out her own interpretation of the imaging results and treatment records and explain why her interpretation, rather than Dr. Hebrard's, was correct. *Reddick*, 157 F.3d at 725. It is worth emphasizing that the ALJ did not rely on any other physician's interpretation of the November 2013 MRIs because these images were obtained after Drs. Amon and Battis reviewed Plaintiff's records. She relied on Dr. McMillan's observations, based on a one-time examination in April 2013 that focused on Plaintiff's heart condition, that Plaintiff normal deep tendon reflexes and there was no evidence of muscular weakness on that day. AR 26. But neither Dr. McMillan nor the ALJ acknowledged Dr. Hebrard's repeated statements that Plaintiff's conditions prevented her from working because flare ups, i.e., intermittent events, would require her to miss work frequently to obtain treatment. The ALJ also failed to acknowledge Dr. Hebrard's observation that Plaintiff's neck and should pain became progressively worse in 2014. The ALJ did not identify what records Drs. Amon and Battis relied upon to reach the conclusion Dr. Hebrard's opinions regarding Plaintiff's physical conditions and pain were not supported by the evidence.[4]

(4) The ALJ found it "significant and less than persuasive" that the overall treatment for Plaintiff's "'totally disabling' and 'permanent' medical disorders consists only of routine monthly office visits and weekly visits for [PT] and acupuncture as needed" and asserts that "[a]pparently no other medical modalities have been considered." AR 28. This is inaccurate. Dr. Hebrard

---

[4] The Court also notes the ALJ did not give weight to the fact Nancy Kersey "frequently" observed Plaintiff to be in pain during their weekly therapy sessions, talked about her pain, and had limitations in using her right arm. AR 29, 614. The ALJ discounted her opinion because she was not an acceptable medical source and physical conditions were outside Ms. Kersey's field of expertise. AR 29. This erroneously ignores the probative value information regarding the severity Plaintiff's impairments and their impact on her ability to work, and also supports the limitations Plaintiff identified in her testimony. *See Haagenson v. Colvin*, 656 Fed. App'x 800, 802 (9th Cir. 2016) (holding that the ALJ failed to provide a germane reason for rejecting "other source" opinion evidence when the "reason that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources' within the meaning of the federal regulation . . . [because] the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources'"); *see also Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011) (lay testimony may be introduced to show severity of impairment and its impact on the claimant's ability to work).

United States District Court
Northern District of California

prescribed Lyrica and cyclobenzaprine for muscle spasms, and noted that NSAIDs were not recommended because of Plaintiff's cardiac condition; he recommended facet injections, for which Plaintiff needed to obtain authorization (presumably from her insurance provider); and while he considered surgical intervention dangerous because of Plaintiff's heart condition, he nonetheless recommended Plaintiff consult with an orthopedic spine surgeon when her neck and shoulder pain worsened. The ALJ also fails to explain what other treatment would have been advised to treat Plaintiff's chronic pain, i.e., what treatment she would expect to accompany Dr. Hebrard's findings. *Cf. Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

(5) The ALJ found it "rather curious" that Dr. Hebrard "makes no mention of" Plaintiff's cardiac status even though that is her main medical complaint. AR 28. As noted immediately above, Dr. Hebrard took Plaintiff's cardiac status into consideration, and his treatment of Plaintiff was informed by that status. The ALJ does not indicate what else Dr. Hebrard, a physical medicine specialist treating Plaintiff's pain and reduced range of motion, should have been doing about Plaintiff's cardiac status.

(6) The ALJ rejected Dr. Hebrard's July 10, 2014 report "for many [of] the same reasons that resulted in his prior report dated December 20, 2013, being entitled to only minimal evidentiary weight." AR 28. But the July 10, 2014 report provides much more information than the certification forms the ALJ dismissed as conclusory. For example, Dr. Hebrard describes the results of the December 2012 MRI and the November 2012 EMG, and states the evidence of possible L5 radiculopathy "explains her complaints of sharp and tingling pains radiating from her lower back and hips." AR 566. Dr. Hebrard links Plaintiff's chronic shoulder pain to the MRI results that showed AC joint degenerative changes with tendinopathy. Dr. Hebrard summarizes the results of his examinations of Plaintiff, which showed trigger points, decreased range of motion of the lumbar spine, sensory deficits, decreased motor strength and positive provocative tests, and he then states, "She has limited functional tolerance and abilities." AR 566. After these descriptions, Dr. Hebrard opines that she has "complex multifactorial medical issues" and is "not a candidate for any full time work" because she requires treatment for office visits and PT due to

19

frequent flare-ups, and if she were to attempt full time work, she would miss approximately five days of work per month. AR 566. The ALJ conclusorily dismissed Dr. Hebrard's report, finding "[t]he overall medical record simply does not contain sufficient objective findings which would substantiate such a markedly severe level of physical dysfunction on an ongoing basis. To the contrary, an MRI scan of the lumbar spine performed on November 13, 2013, was indicative of only disc desiccation at L2-3 and L3-4 with 'minimal' disc bulging as well as a resolved synovial cyst." AR 28. The ALJ does not acknowledge (much less explain) the abnormal results Dr. Hebrard repeatedly found during his examinations of Plaintiff. Nor does the ALJ explain the basis for her conclusion that those abnormal results or the conditions identified in the MRI scan did not support Dr. Hebrard's opinions that Plaintiff would experience disabling flare-ups and would need to miss approximately five days of work per month to treat those flare ups.

    4. <u>Summary</u>

The ALJ did not provide specific and legitimate reasons, based on substantial evidence, for rejecting Dr. Hebrard's opinions. Accordingly, the Court GRANTS Plaintiff's Motion on this ground and REMANDS the case for further proceedings. On remand, the ALJ shall carefully analyze Dr. Hebrard's treatment records, as well as the other medical evidence of record, including the MRI results from 2014. If the ALJ again discounts Dr. Hebrard's opinions, she must analyze specific evidence in the record that supports and detracts from her decision, and may not simply refer generally to exhibits without interpreting them.

**B.    Plaintiff's Credibility**

Where there is no showing that a claimant is malingering, and where the record includes objective medical evidence establishing that a claimant suffers from an impairment that could reasonably produce the symptoms complained of, an ALJ can only make an adverse credibility finding based on substantial evidence under the "clear and convincing" standard. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). There is no indication of malingering in the record, and the ALJ concluded Plaintiff's medically determinable impairments could reasonably be expected to cause

associated symptomatology. AR 30. The ALJ's adverse credibility finding therefore must be based on clear and convincing substantial evidence. *See Carmickle*, 533 F.3d at 1160. In addition, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834.

The ALJ found Plaintiff's testimony neither "persuasive or particularly credible" for two reasons:

(1) Plaintiff's reported symptomatology and functional restrictions were significantly out of proportion to the findings contained in the objective medical record, "such as the allegation that the claimant continues to have chronic significant swelling in the lower extremities." AR 25. As described above, Dr. Hebrard's progress notes document numerous and consistently abnormal results to several "provocative tests," decreased range of motion, loss of sensation, weakness, and numerous trigger points consistent with a fibromyalgia diagnosis; the physical therapy progress notes also document pain and reduced range of motion; and the imaging results show mild to moderate changes to Plaintiff's lumber and cervical spine. Plaintiff's treatment records also document ongoing edema in Plaintiff's lower extremities. *See* AR 274 (March 1, 2013), 296 (March 14, 2013), 467 (April 8, 2013), 510 (October 3, 2013; ER admission for ankle swelling), 641 (October 7, 2013), 603 (October 21, 2013), 574 (August 25, 2014). And perhaps most important, Dr. Hebrard's treatment records document his observation that Plaintiff's symptoms have progressively worsened. The ALJ's failure to analyze Dr. Hebrard's treatment records or to develop the record to allow Dr. Hebrard to explain the basis for his opinions does not constitute a clear and convincing reason for the adverse credibility finding.

Moreover, besides the specific reference to edema, the ALJ failed to identify which specific portions of Plaintiff's testimony she discredited, and on what basis she discredited the testimony. *See* AR 25 ("Overall, I find that the statements of record from the claimant . . . as well as the testimony received at the hearing, set forth symptomatology and functional restrictions which are significantly out of proportion to the findings contained in the objective medical record, such as the allegation that the claimant continues to have chronic significant swelling in the lower

extremities."). As such, the ALJ's findings are insufficiently "specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds." *Bunnell v. Sullivan*, 947 F.2d 341, 345-47 (9th Cir. 1991) (adjudicator must make specific findings, supported by the record, to discredit claimant's allegations of pain; "the adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence").

(2)   Although she alleged disability as of August 27, 2012, she continued to work part time through most of 2013. AR 30. The fact a claimant worked after the alleged date of onset is evidence the claimant was not totally disabled. *See, e.g., Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Gregory v. Bowen*, 844 F.2d 664, 666–67 (9th Cir. 1988). But here, Plaintiff's earnings records show she earned $1,763 in 2013. AR 193. Her hourly rate was $8.00. AR 201. Thus, in 2013, she worked a total of 220 hours. Over 52 weeks, this is approximately four hours a week. The evidence shows that Dr. Hebrard took Plaintiff off work and/or placed her on a reduced schedule for several months in 2013, that Plaintiff took time off in connection with her heart ablation procedure, that her employer reduced her to three hours per week in July 2013, and that she stopped working entirely after November 2013. This evidence is entirely consistent with Dr. Hebrard's opinion that Plaintiff is not qualified for full-time employment because flare-ups in her condition would require her to take time off, and his opinion that Plaintiff's symptoms progressively worsened over time. The fact Plaintiff continued to work part-time in 2013, in between periods of total disability, when her condition was not flaring up therefore does not constitute a clear and convincing reason for discrediting her testimony.

The Court notes the ALJ chose not to cross-examine Plaintiff during the original hearing, and thus did not take the opportunity to address any concerns she may have had regarding Plaintiff's credibility about her symptoms. On remand, the ALJ shall reevaluate Plaintiff's credibility. If she continues to reject Plaintiff's testimony about the severity of her symptoms, the ALJ shall "specifically identify the testimony she . . . finds not to be credible," and provide "specific, clear and convincing reasons" to explain her determination. *Holohan*, 246 F.3d at 1208;

22

*Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014).

## CONCLUSION

In reviewing a Social Security Commissioner's decision, a court may remand the case "either for additional evidence and findings or to award benefits." *Smolen*, 80 F.3d at 1292. Typically, when a court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Moreover, "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a disability determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." *Taylor*, 659 F.3d at 1235 (reversing and remanding for the consideration of new evidence instead of awarding benefits). The case is properly remanded for further proceedings rather than an award for benefits because further proceedings would serve a useful purpose and because the court cannot say that the ALJ would be required to find Plaintiff disabled. *See Garrison*, 759 F.3d at 1020.

For these reasons, and because the ALJ failed to fully and fairly develop the record when evaluating Plaintiff's disability claim, the Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, **DENIES** Defendant's Cross-Motion for Summary Judgment, and **REVERSES** the ALJ's decision. This case is **REMANDED** for further administrative proceedings in accordance with this Order.

The Court will issue a separate judgment.

**IT IS SO ORDERED.**

Dated: August 31, 2017

_____

MARIA-ELENA JAMES
United States Magistrate Judge